# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

JOHN REYNOLDS and DEANNA :      CIVIL ACTION
REYNOLDS,
                     :

     Plaintiffs,
                     :

        v.
                     :

FLORIDA HIGHWAY PRODUCTS, INC.,
                     :

     Defendant/Third Party
     Plaintiff,           :

        v.
                     :

DONALD HUNTER d/b/a HUNTER :
CONSTRUCTION,
                     :

     Third Party Defendant.
                     :      No. CV507-78

## ORDER

Plaintiffs John Reynolds and Deanna Reynolds filed the above-captioned case against Defendant Florida Highway Products, Inc. (hereinafter "FHP"), in the State Court of Bacon County, Georgia, asserting claims for negligence, breach of express and implied warranties, breach of contract, fraud, intentional infliction of emotional distress, punitive damages, and attorney's fees and expenses. Complaint ¶¶ 16-

34. Doc. No. 1. As part of their alleged damages, Plaintiffs assert that, due to FHP's actions, they have lost future profits. Id. ¶ 36. The case was removed by FHP to this Court based on diversity of citizenship. Notice of Removal ¶¶ 1-9. Doc. No. 1.

After removing the case to this Court, FHP filed its answer to Plaintiffs' complaint, and simultaneously asserted a counterclaim against Plaintiffs for breach of contract. Answer, Defenses and Counterclaim ¶¶ 1-5. Doc. No. 4. FHP then filed a third party complaint against Donald Hunter d/b/a/ Hunter Construction (hereinafter "Hunter), asserting a claim for contribution. Third Party Complaint ¶¶ 15-16. Doc. No. 21.

Presently before the Court is FHP's motion for partial summary judgment. In its motion, FHP asserts that it is entitled to summary judgment on Plaintiffs' claims for lost profits, intentional infliction of emotional distress, fraud, punitive damages, and attorney's fees and expenses. Defendant's Motion for Partial Summary Judgment at 1. Doc. No. 35. For the reasons set forth below, Defendants' motion will be **GRANTED** in part and **DENIED** in part.

## **BACKGROUND**

The following facts are viewed, as they must be in this stage of the litigation, in a light most favorable to the non-movant. In 2006, Plaintiffs purchased undeveloped land in Bacon County, Georgia for the purpose of building and operating a truck stop and convenience store. Because Plaintiffs had no prior experience with construction, they hired various companies and individuals to develop the property for this purpose.

While planning the construction of the truck stop, Plaintiffs learned of a relatively new type of asphalt product that had been used to pave roadways in another Georgia county. The asphalt was known as "open grade emulsion mix," or "OGEM," and was different from traditional asphalt in several ways. According to the undisputed evidence presented, OGEM is prepared by combining rock aggregate with a liquid emulsion in a mixer at the job site. The emulsion acts like a glue that binds the aggregate together to form a hard surface once it has hardened, or "cured." OGEM is generally designed to be a porous material that allows water to freely penetrate its surface. OGEM is one of the types of asphalt that is available from FHP.

After learning of OGEM, Plaintiffs contacted John Depp, a consultant for FHP. Depp was a regional manager consultant who had worked for FHP for eleven years. In the fall of 2006, Depp traveled to the proposed truck stop location to meet with Plaintiffs. Depp discussed the advantages of OGEM and the suitability of using OGEM to pave Plaintiffs' truck stop.

After meeting with Depp, in December 2006, Plaintiffs entered into a contract with FHP to pave their truck stop parking lot with OGEM. By proposal dated December 20, 2006, FHP agreed to provide certain materials and equipment to pave Plaintiffs' truck stop with the OGEM product. Prior to FHP performing any paving activities, Plaintiffs had agreed to provide the "base" or "subgrade" necessary to support FHP's OGEM product. Plaintiff hired Hunter to install the sub-base and base prior to FHP's application of the asphalt. The sub-base and base were installed prior to FHP commencing its work.

On March 19, 2007, FHP traveled to Plaintiffs' truck stop and began to pave the parking lot with OGEM. After some mechanical difficulties, FHP paved approximately half of Plaintiffs' parking lot and left the site on Friday, March 23, 2007. Among the members of the crew dispatched by FHP to

Plaintiffs' truck stop to lay the asphalt were Depp and Delbert White, who at the time was a paver operator with FHP.

According to White, even before he arrived at the job site to begin paving, he did not believe that OGEM was suitable for use at a truck stop. Delbert White Dep. 11-12, Exhibit "F" to Plaintiffs' Response to Defendant's Motion for Partial Summary Judgment. White testified that, although he voiced these concerns to John Klein, FHP's senior project manager, Klein told him that if he wanted to keep his job, he would keep his "mouth shut and do it." Id. at 12. White testified that he also shared his concerns with John McLaughlin, his supervisor on the job site, as well as Depp. Id. at 12-15. According to White, both McLaughlin and Depp agreed that OGEM was not a suitable asphalt for the job. Id. Despite these alleged concerns, the evidence indicates that FHP nevertheless used OGEM to pave Plaintiffs' truck stop.

Not long after paving began, White noticed that the OGEM product was not hardening as it was supposed to do. According to White, even after three days of paving, the pavement remained as soft as it had been when it was first applied. White Dep. 16. White testified that the pavement remained

soft enough that it could be dug out with a shovel and even with someone's foot. Id. at 21.

On April 10, 2007, FHP again traveled to Plaintiffs' truck stop to finish the paving job. According to White, when the crews arrived, the OGEM asphalt that FHP had applied during their first visit was still soft. Id. at 22-23. In his deposition, White testified that the other members of FHP's crew were also aware that the asphalt "was[] no good." Id. at 23. White further testified that, after observing the soft asphalt, he and other FHP crew members recommended to Depp that the existing OGEM asphalt be ripped up, and that conventional asphalt be applied in its place. Id. at 23-24. According to White, Depp agreed with this recommendation. Id. at 24. However, White testified that, despite these recommendations, and despite the fact that the OGEM was still soft, FHP nonetheless directed that the rest of Plaintiffs' parking lot be paved in the same manner, with the OGEM asphalt. Id. at 24-25.

Another FHP employee involved in paving Plaintiffs' truck stop, grade operator Dennis Harned, testified in his deposition that he found it "surprising" that the OGEM was still soft and could be kicked up with his foot during FHP's

second trip to Plaintiffs' truck stop. Dennis Harned Dep. at 20-21, Exhibit "C" to Plaintiffs' Response to Defendant's Motion for Partial Summary Judgment. Harned testified that the fact that the OGEM was still soft after two weeks indicated that there was a problem with the asphalt. Id. at 27-28, 41. Like White, Harned testified that everyone on the FHP crew was aware that the OGEM had not hardened upon FHP's return to the truck stop. Id. at 21. According to Harned, the entire crew found it surprising that the asphalt was still soft. Id.

Mr. Depp also testified that, by the time FHP came back to complete the paving job in April, the OGEM that had already been laid had not hardened as he expected it to. John Depp Dep. 28, Exhibit "D" to Plaintiffs' Response to Defendant's Motion for Partial Summary Judgment. Despite the alleged obvious problems with the OGEM, however, the facts show that FHP completed paving Plaintiffs' truck stop with the OGEM product on or about April 13 or 14, 2007. In his deposition, White testified that, when he left the job at Plaintiffs' truck stop, he knew that the OGEM would never harden and thought that FHP should have done something about it. White Dep. 32-33.

After FHP completed the paving project at Plaintiffs'
truck stop, Plaintiff John Reynolds contacted Rob Maggard, the
president of FHP, to inform him that the OGEM still had not
hardened as it was supposed to.  After learning of Plaintiffs'
concerns, Maggard and Klein met with Plaintiffs at the truck
stop.  According to Plaintiff Deanna Reynolds' father, Jeffrey
Deen, who was present at the meeting, after Plaintiffs showed
Maggard and Klein that the asphalt was still soft and could be
kicked up with a shoe, Klein threatened to start a "pissing
match" if Plaintiffs continued to insist that the OGEM was not
suitable.  Jeffrey Deen Dep. 32, Exhibit "E" to Defendant's
Motion for Partial Summary Judgment.  Plaintiffs also allege
that Maggard and Klein used profanity during their meeting
with Plaintiffs, although testimony by Jeffrey Deen suggests
that this profanity was not directed at either Plaintiff, but
was instead used by Maggard while he was talking on his cell
phone.  Deen Dep. 32.  According to Deen, no arguments took
place during the meeting.  Id.

According to Plaintiffs, in response to their concerns,
Maggard and Klein told Plaintiffs that they would send someone

to the truck stop to apply a "fog seal"[1] on the asphalt.  A couple of days later, White arrived at the truck stop to apply the fog seal.  According to White, at the time he arrived, he did not believe that the fog seal would fix the problems with the OGEM.  White Dep. 35.  White testified that, when he arrived to apply the seal, the OGEM was still just as soft as it was at the end of FHP's second visit to the site.  Id. at 35.  White testified that, after he was done applying the seal, he again complained to FHP supervisors that the OGEM asphalt was too soft.  Id. at 36-37.  He testified that, in response to these concerns, he was told that it was none of his business.  Id. at 36.

According to Plaintiffs, the OGEM laid by FHP at Plaintiffs' truck stop has never hardened and remains soft to this day.  Plaintiffs allege that, due to the failure of the OGEM product and its inability to withstand vehicular traffic, Plaintiffs' truck stop was never able to open.

---

[1]According to Plaintiffs' brief, a fog seal is an application of liquid emulsion that is sprayed over the top of asphalt.

**SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in his favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991)(en banc)(internal quotation marks omitted).


**DISCUSSION**

FHP has moved for summary judgment on Plaintiff's claims for lost profits, intentional infliction of emotional distress, fraud, punitive damages, and attorney's fees and expenses.

## I. **Lost Profits**

In a diversity case such as this, the determination of damages constitutes a substantive issue. Crider v. Convenience Food Sys., Inc., No. CV604-102, 2005 U.S. Dist. LEXIS 34943, at *6 (S.D. Ga. Dec. 2, 2005) (citing McDermott v. Middle E. Carpet Co., Assoc., 811 F.2d 1422, 1426 (11th Cir. 1987)). "Georgia law, therefore, governs the issue of damages for lost profits." Id.

In Georgia, "courts have shown reluctance in awarding lost profits to new business ventures[.]" Id. at 9 (quoting McDermott, 811 F.2d at 1427). Indeed, "[a] party may recover lost profits 'only if the business has a proven track record of profitability.'" Id. at 10 (quoting Empire Shoe Co. v. NICO Indus., Inc., 398 S.E.2d 440, 443 (Ga. Ct. App. 1990)). This "track record can be a history of profits, or a pattern of diminishing losses for a new business, so long as the evidence renders anticipated profits reasonably ascertainable." Id. at 11-12 (quoting Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1452 (11th Cir. 1991)).

Citing the Georgia Court of Appeal's decision in Authentic Architectural Millworks, Inc. v. SCM Group USA,

<u>Inc.</u>, 586 S.E.2d 726, 731 (Ga. Ct. App. 2003), this Court in

<u>Crider</u> held:

> Ordinarily, anticipated profits are too speculative
> to be recovered, but where the business has been
> established, has made profits and there are
> definite, certain and reasonable date for their
> ascertainment, and such profits (were) in the
> contemplation of the parties at the time of the
> contract, they may be recovered . . . even though
> they can not be computed with exact mathematical
> certainty.

<u>Crider</u>, 2005 U.S. Dist. LEXIS 34943, at *10 (internal

quotation marks omitted). Similarly, the Georgia Court of

Appeals has held that:

> The general rule is that evidence of expected
> profits from a new business is too speculative,
> uncertain, and remote to be considered, and does not
> meet the legal standard of reasonable certainty.
> Accordingly, recovery of lost profits is not
> generally allowed for injury to a new business with
> no history of profits.

<u>Topvalco, Inc. v. Garner</u>, 436 S.E.2d 25, 28 (Ga. Ct. App.

1993)(<u>quoting</u> <u>Radlo of Ga. v. Little</u>, 199 S.E.2d 835, 838 (Ga.

Ct. App. 1973)); <u>see also</u> <u>Life Systems, Inc. v. Fisher</u>

<u>Scientific Group, Inc.</u>, No. CV487-153, 1988 U.S. Dist. LEXIS

2326, at *44 (S.D. Ga. March 15, 1988)("The loss of

anticipated profits from a new business . . . are generally

thought to be too speculative and conjectural to permit

recovery.").

To prove lost profits, Plaintiffs in this case have submitted a document labeled "Projected Operating Statement." See Exhibit "O" to Plaintiffs' Response to Defendant's Motion for Partial Summary Judgment. According to Plaintiffs, the information contained in this projection was obtained, in part, from a representative of Lewis & Raulerson Oil Company, which owns convenience stores known as "Friendly Express." Plaintiffs allege that the projection is based on the profitability of a truck stop convenience store owned by Lewis & Raulerson. According to Plaintiffs, "[t]hese figures provide a rational basis upon which Plaintiffs' lost profits, at least for the first year, could be calculated." Plaintiffs' Response to Defendant's Motion for Partial Summary Judgment at 22.

Plaintiffs' evidence regarding lost profits is not sufficient to defeat summary judgment. Although Plaintiffs allege that the figures in the Projected Operating Statement provide a rational basis upon which Plaintiffs' lost profits could be calculated, the evidence suggests otherwise. Instead, the projections made in the statement are too speculative and conjectural to permit recovery. When asked about the basis for the figures included in the statement,

Plaintiff Deanna Reynolds testified that someone from Lewis & Raulerson gave her the numbers based on one of the company's existing stores. Deanna Reynolds Dep. 132, Exhibit "A" to Plaintiffs' Response to Defendant's Motion for Partial Summary Judgment. However, she admitted to having no knowledge about what store had been used in the projection, where the store was located, or how long the store had been open. Id. at 132-133. To base the expected profits of Plaintiffs' store on the profits of an unknown store, in an unknown location, is the definition of speculation and conjecture, and is the very thing that Georgia's new business rule is designed to prevent. Topvalco, Inc., 436 S.E.2d at 28.

Further, the Projected Operating Statement presented by Plaintiffs in this case is based upon Plaintiffs' own expectations and assumptions. Attached to the statement is a list of nine assumptions that were relied upon in arriving at the figures listed in the statement. These assumptions deal with average sales of gasoline, groceries, alcohol, tobacco, and food, as well as projected labor costs, interest rates on business loans, insurance and tax expenses, including anticipated property taxes, and credit card fees. Deanna Reynolds admits in her deposition that she was responsible for

putting together these assumptions. Deanna Reynolds Dep. 133. Because the Projected Operating Statement was prepared based on the figures from an unknown store in an unknown location, it would be pure speculation to determine whether these figures would be similar to the profits that might have been enjoyed by Plaintiffs' store had it opened as planned. Unlike mankind, all convenience stores are not "created equal"—revenue from sales of products like gasoline, food and cigarettes necessarily differ depending on the store's location and number of customers it enjoys. It would be impossible for a jury to decide, based on the evidence presented, whether the figures contained in the Projected Operating Statement would have, in fact, been similar to the actual sales figures at Plaintiffs' store if it would have opened as planned.

The Georgia Court of Appeals' decision in <u>Market Place Shopping Center, L.P. v. Basic Business Alternatives, Inc.</u>, 489 S.E.2d 162 (Ga. Ct. App. 1997), is instructive. In that case, a tenant-business sued its landlord for breach of a leasehold covenant not to rent space to another competing business. <u>Id.</u> at 163-64. Following a bench trial, the trial court awarded damages to the plaintiff based on expert

testimony estimating lost profits.  <u>Id.</u> at 422.  The court
noted that:

> Although the expert testified that he reviewed
> industry standards with regard to profitability of
> businesses similar to that operated by [the
> plaintiff], his calculations were nevertheless based
> on estimates and expectations of profit held by [the
> plaintiff] . . . . He agreed that his calculations
> were based on expectations and assumptions and that
> he was required to make these assumptions because
> the new business did not provide him with a
> sufficient "database."

<u>Id.</u> at 166.  The expert in <u>Basic Business Alternatives, Inc.</u>
also acknowledged that the plaintiff in that case "had neither
an established business nor a history of profitability."  <u>Id.</u>

The Georgia Court of Appeals held that the plaintiff's
evidence of lost profits "was based entirely on speculation
and conjecture," and reversed the trial court's award of
damages to the plaintiff.  <u>Id.</u>  The court noted that the
business at issue was "in its incipiency, by definition a
newly-begun enterprise."  <u>Id.</u>  The court concluded by holding
that, "in the circumstances presented here, there plainly
exists no basis upon which a reasonably accurate computation
of lost profits might be made."  <u>Id.</u>

Like the business at issue in <u>Basic Business
Alternatives, Inc.</u>, the business at issue here was not an
established business and has no history of profitability.  The

Projected Operating Statement presented by Plaintiffs in this case, like the expert testimony relied upon by the plaintiffs in <u>Basic Business Alternatives, Inc.</u>, is speculative and, therefore, cannot serve as a basis upon which a reasonably accurate computation of lost profits can be made.

To support their argument that summary judgment should be denied, Plaintiffs cite the Eleventh Circuit's decision in <u>McDermott</u>, as well as this Court's decision in <u>Crider</u>. Plaintiffs are correct in noting that, in both of those cases, the court denied summary judgment to a defendant on the issue of lost profits even though the plaintiff was a new business venture with no prior history of profitability. However, as Plaintiffs acknowledge in their brief, in both <u>McDermott</u> and <u>Crider</u>, the businesses experienced subsequent profitability that was used as the basis for calculating the plaintiffs' damages. <u>See</u> <u>McDermott</u>, 811 F.2d at 1427-28; <u>Crider</u>, 2005 U.S. Dist. LEXIS 34943, at *11-12. Both the Eleventh Circuit in <u>McDermott</u>, and this Court in <u>Crider</u>, focused on the existence of this subsequent profitability in denying summary judgment. <u>See</u> <u>McDermott</u>, 811 F.2d at 1428 ("Where, however, as here, a claimant can show a 'track record' of profitability, evidence can be considered and lost profits can

be awarded."); <u>Crider</u>, 2005 U.S. Dist. LEXIS 34943, at *12 (holding that, based on <u>McDermott</u>, Georgia's new business rule does not apply where profitability can be established by a subsequent history of profits). Unlike the businesses at issue in <u>McDermott</u> and <u>Crider</u>, the business at issue in this case has not yet began to operate and, therefore, cannot point to any subsequent profitability. Accordingly, summary judgment in favor of FHP on Plaintiffs' claim for lost profits is appropriate.

## II.  **FRAUD**

Plaintiffs also assert a claim for fraud. According to Plaintiffs, FHP fraudulently told Plaintiffs that OGEM was appropriate for their truck stop parking lot, when it was not, thereby inducing Plaintiffs to hire FHP to pave their property. Plaintiffs' Brief at 11. Plaintiffs further allege that, as the paving occurred, FHP was aware that its OGEM product was not behaving properly but fraudulently continued to tell Plaintiffs that the product was appropriate for this application. <u>Id.</u> at 11-12. Plaintiffs allege that these misrepresentations were made with knowledge of their falsity, and that FHP intended to, and did, induce Plaintiffs' reliance

on these misrepresentations to Plaintiffs' detriment.  Id. at 16-18.

In Georgia, five elements must be proven in order to establish the tort of fraud:

> (1) a false misrepresentation; (2) scienter; (3) intention to induce plaintiff to act or refrain from acting; (4) justifiable reliance by plaintiff; and (5) damage to plaintiff.

Scarbrough v. Hallam, 525 S.E.2d 377, 379 (Ga. Ct. App. 1999). Importantly, Georgia courts have held that a fraud claim survives summary judgment where the plaintiff presents even the slightest of circumstantial evidence.  In Lloyd v. Kramer, for instance, the Georgia Court of Appeals held that "[s]ince fraud is inherently subtle, slight circumstances of fraud may be sufficient to establish a proper case."  503 S.E.2d 632, 633 (Ga. Ct. App. 1998).  The court in Lloyd went on to hold that "'[p]roof of fraud is seldom if ever susceptible of direct proof, thus recourse to circumstantial evidence is required.'  Moreover, 'it is peculiarly the province of the jury to pass on these circumstances [showing fraud].'"  Id. (internal citations omitted)(quoting McNeil v. Cowart, 367 S.E.2d 291, 292 (Ga. Ct. App. 1988), and Farmers State Bank v. Huguenin, 469 S.E.2d 34, 37 (Ga. Ct. App. 1996)).

Plaintiffs in this case have presented enough evidence to defeat summary judgment on their fraud claim. First, Plaintiffs have presented evidence sufficient for a reasonable jury to conclude that FHP made false misrepresentations, and that these misrepresentations were made with scienter. As discussed, the evidence presented could lead a reasonable jury to conclude that agents of FHP told Plaintiffs that OGEM was appropriate for their truck stop parking lot. Also, the evidence could be construed to prove that, as the paving occurred, FHP was aware that its OGEM product was not curing as it was supposed to, but that FHP continued to tell Plaintiffs that the product was appropriate for this application.

Although, under Georgia law, fraud cannot normally be predicated upon statements which are promissory in their nature as to future acts, "fraud can be based on a misrepresentation of future events if the person making the misrepresentation at that time knew that the future event would not take place." Pelletier v. Stuart-James Co., Inc., 863 F.2d 1550, 1559 (11th Cir. 1989)(emphasis added)(citing Hines v. Good Housekeeping Shop, 291 S.E.2d 238, (Ga. Ct. App. 1982)). Further, the existence of scienter is generally a

jury question. <u>Allstate Ins. Co. v. Sutton</u>, 658 S.E.2d 909, 916 (Ga. Ct. App. 2008).

In this case, Plaintiffs have presented evidence which, if believed, might prove that FHP representatives knew, before recommending OGEM to Plaintiffs, that OGEM was not an appropriate product for paving a truck stop parking lot. <u>See, e.g.</u>, White Dep. 11-15. Plaintiffs have also presented evidence indicating that, as the paving got under way, agents of FHP were aware that the OGEM was not properly hardening, yet continued to tell Plaintiffs that the product was appropriate for this application. <u>See, e.g.</u>, <u>Id.</u> at 22-25; Harned Dep. 20-21; Depp Dep. 28.

Finally, there is sufficient evidence for a reasonable jury to conclude that FHP made these allegedly false misrepresentations with the intention of inducing Plaintiffs to act, and that Plaintiffs justifiably relied on the misrepresentations to their detriment. Generally, the question of whether reasonable reliance exists is a jury question. <u>See, e.g.</u>, <u>Mitchell v. Backus Cadillac-Pontiac, Inc.</u>, 618 S.E.2d 87, 94 (Ga. Ct. App. 2005). In this case, given Plaintiffs' alleged lack of knowledge with OGEM paving and FHP's alleged extensive experience with it, a jury could

reasonably conclude that Plaintiffs' reliance upon FHP's alleged misrepresentations was reasonable and justified. Therefore, summary judgment is not proper on Plaintiffs' fraud claim.


III. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Next, Plaintiffs assert a claim for intentional infliction of emotional distress. Specifically, Plaintiffs allege that FHP's conduct "was reckless and extreme and outrageous," and that this conduct "was the cause of Plaintiff Deanna Reynolds's severe emotional distress." Complaint ¶¶ 30-31. FHP asserts that this claim must fail as a matter of law.

In Georgia, to succeed on a claim for intentional infliction of emotional distress, a plaintiff must establish all four of the following elements:

> "(1) The conduct must be intentional or reckless;
> (2) The conduct must be extreme and outrageous; (3)
> There must be a causal connection between the
> wrongful conduct and the emotional distress; (and)
> (4) The emotional distress must be severe."

Phinazee v. Interstate Nationalease, Inc., 514 S.E.2d 843, 844-45 (Ga. Ct. App. 1999) (quoting Hendrix v. Phillips, 428 S.E.2d 91, 91 (Ga. Ct. App. 1993)). Although allegations of

intentional infliction of emotional distress certainly have a strict burden to overcome in order to survive summary judgment, the burden is not an impossible one. The Georgia Supreme Court has held that "[i]f the evidence shows that reasonable persons might find the presence of extreme and outrageous conduct and resultingly severe emotional distress, the jury then must find the facts and make its own determination." Yarbray v. S. Bell Tel. & Tel. Co., 409 S.E.2d 835, 838 (Ga. 1991). See also Travis Pruitt & Assocs., P.C. v. Hooper, 625 S.E.2d 445, 452 (Ga. Ct. App. 2005)("[I]f there is evidence from which a reasonable person could find severe emotional distress resulting from extreme and outrageous conduct, then the issue is for the jury.").

In this case, Plaintiffs allege that Deanna Reynolds suffered severe emotional distress as a result of FHP's allegedly outrageous conduct. Complaint ¶ 31. Further, Plaintiffs have presented evidence to show that Ms. Reynolds did, in fact, suffer severe emotional distress. Specifically, Plaintiffs have presented Ms. Reynolds' medical records, which indicate that, in the summer of 2007, Ms. Reynolds began to suffer from anxiety and stress. See Medical Records, Exhibit "A" to Plaintiffs' Response to Defendant's Motion for Partial

Summary Judgment, Tab A. The medical records indicate that, in July 2007, Ms. Reynolds informed her physician that the stress and anxiety had been occurring for approximately three months, and was likely the result of the present lawsuit and the alleged fraud that led to Plaintiffs' filing of the lawsuit. Id.

However, Plaintiffs do not allege that Deanna Reynolds suffered any physical injury as a result of FHP's allegedly outrageous conduct. The Georgia Court of Appeals has held that "for [a plaintiff] to recover damages for emotional distress in the absence of physical injury or pecuniary loss resulting from physical injury, there must be evidence that [the defendant]'s conduct directed at [the plaintiff] was malicious, wilful, and wanton." Hooper, 625 S.E.2d at 452. The court in Hooper went on to hold that:

> The test used to determine whether conduct was malicious, wilful, and wanton is essentially the same as the test for recovery of punitive damages. Under that test, there must be evidence of wilful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences.

Id. (emphasis added). Under Hooper, then, because there is sufficient evidence in this case to defeat summary judgment on Plaintiffs' fraud claim, Plaintiffs' claim for intentional

-24-

infliction of emotional distress also survives summary judgment. Plaintiffs have presented evidence which, if believed, would support a jury finding that FHP's fraudulent conduct caused Ms. Reynolds' severe emotional distress.[2]

## IV.  **PUNITIVE DAMAGES**

Plaintiffs claim that they are entitled to punitive damages, because FHP's "fraudulent and reckless conduct towards Plaintiffs show willful misconduct, malice, fraud, wantonness, [and] oppression." Complaint ¶ 33.

In Georgia, the availability of punitive damages is governed by statute. The Georgia Code provides that "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care

---

[2]This is not to say, of course, that every case of fraud justifies a recovery for intentional infliction of emotional distress. Instead, evidence of fraud can satisfy a plaintiff's burden of proving extreme and outrageous behavior. A plaintiff asserting a claim for intentional infliction of emotional distress must still satisfy its burden of proving severe emotional distress and causation. In this case, Plaintiffs have met that burden.

which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b)(emphasis added).

As the Georgia Court of Appeals noted in <u>Hooper</u>, the test for punitive damages and the test for whether a defendant's conduct was malicious, wilful, and wanton for purposes of establishing a claim for intentional infliction of emotional distress, is essentially the same. <u>Hooper</u>, 625 S.E.2d at 452. As discussed, Plaintiffs have presented sufficient evidence for a reasonable jury to conclude that FHP's actions showed willful misconduct, malice, fraud, and wantonness. Therefore, summary judgment is not proper.


## V.  **ATTORNEY'S FEES AND EXPENSES**

Georgia law authorizes an award of attorney's fee and expenses of litigation "where the defendant has acted in bad faith, had been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A. § 13-6-11.  The Georgia Court of Appeals has held that "[t]he plaintiff need not show that all three provisions of the statute are present, but only that one of the three conditions exist." <u>Parking Co. Of Am. v. Sucan</u>, 394 S.E.2d 411, 413 (Ga. Ct. App. 1990).

In this case, Plaintiffs assert that they are entitled to attorney's fees and expenses because FHP acted in bad faith in dealing with Plaintiffs in the underlying transaction. The Georgia Court of Appeals has held that "[a] plaintiff may recover for bad faith concerning the transactions and dealings out of which the cause of action arose . . . Despite the existence of a bona fide controversy as to liability, a jury may find that defendant 'acted in the most atrocious bad faith in dealing with the plaintiff.'" Fid. Nat'l Bank v. Kneller, 390 S.E.2d 55, 61 (Ga. Ct. App. 1989)(internal citations omitted)(quoting Powell v. Watson, 378 S.E.2d 867, 867-68 (Ga. Ct. App. 1989)).

In Hudspeth v. A & H Construction, Inc., the Georgia Court of Appeals held that "[i]t is well established as the law of this state that every intentional tort invokes a species of bad faith and entitles a person so wronged to recover the expenses of litigation including attorney fees." 242 S.E.2d 296, 298 (Ga. Ct. App. 1978). Fraud, of course, is an intentional tort in Georgia. Therefore, for the same reasons that summary judgment is not appropriate as to Plaintiffs' fraud claim, summary judgment is also not proper as to Plaintiffs' claim for attorney's fees and expenses.

**CONCLUSION**

Although the evidence submitted by Plaintiffs to support their intentional infliction of emotional distress, fraud, and punitive damages claims may not be strong, it is not the role of this Court to weigh it. For the reasons set forth above, Defendant's motion for partial summary judgment is **GRANTED** in part and **DENIED** in part. Doc. No. 35. Defendant's motion is granted as to Plaintiffs' claim for lost profits. However, Defendant's motion is denied as to Plaintiffs' claims for fraud, intentional infliction of emotional distress, punitive damages, and attorney's fees and expenses.

**SO ORDERED** this __31st__ day of December, 2008.

_____
Judge, United States District Court
Southern District of Georgia